NICHOLAS A. TRUTANICH
United States Attorney
Nevada Bar No. 13644
SUPRIYA PRASAD
Assistant United States Attorney
District of Nevada
501 Las Vegas Blvd. So., Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
supriya.prasad@usdoj.gov
*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

CAMERON COLLINGS,

        Defendant.

2:19-cr-00311-JCM -DJA

**Response to Defendant's Sentencing Memorandum (ECF No. 20)**

### I.    Introduction

Cameron Collings's conduct in this case warrants a sentence of 87 months' incarceration and a lifetime term of supervised release. Collings possessed four images and 481 videos of child pornography between five different digital devices. Collings's receipt and possession of child pornography, according to Collings's own admission, began at age 18 and continued for eight years until a search warrant was executed at his home. The child pornography on Collings's devices included videos of children as young as infants being sexually assaulted. An 87-month sentence is sufficient, but not greater than necessary, to further the goals of sentencing. The government also requests a lifetime term of supervised release.

## II.    Statement of Facts and Procedural History

In November 2014, Special Agent William Hedges of Homeland Security Investigations ("HSI") initiated an undercover investigation on the Gnutella peer-to-peer network. Presentence Investigation Report ("PSR") at ¶ 9. Using law enforcement software which permitted downloads from a single source, Special Agent Hedges identified an IP address offering to share numerous files known to be associated with child pornography. *Id.* On December 8, 2014, Special Agent Hedges downloaded six video files from that same IP, which was registered to Collings at his residence. *Id.* at ¶¶ 9–10. Special Agent Hedges reviewed the files and confirmed they all depicted child pornography. *Id.* at ¶ 10. The files depicted children as young as infants being sexually assaulted. *Id.*

Special Agent Hedges subsequently applied for and executed a search warrant for Collings's residence. *Id.* at ¶ 11. Collings was home along with his five tenants. *Id.* at ¶¶ 11, 13. Agents interviewed Collings, and Collings identified the master bedroom and the digital devices found there as his. *Id.* at ¶ 13. Collings claimed that he had a general awareness of peer-to-peer file sharing programs and stated that he has inadvertently downloaded child pornography when downloading adult pornography. *Id.* Collings's tenants all denied ever downloading child pornography. *Id.* at ¶ 14.

More than 20 electronic items were seized, including a Hewlett-Packard computer tower, an ASUS laptop, a Toshiba laptop, and a Western Digital external hard drive. *Id.* at ¶ 12. Those four devices were all found in Collings's bedroom. *Id.* A forensic analyst previewed the digital devices in Collings's bedroom and located child pornography on a computer. *Id.* at ¶ 15. Agents disclosed that they located child pornography on Collings's computer, and Collings admitted that he downloaded and viewed child pornography. *Id.* at ¶ 16. Collings stated that he used the search term "PTHC" to search for child pornography,

1    but claimed that he did not know what "PTHC" meant. *Id.* Collings, who was 26 years old

2    at the time of the interview, reported that he began searching and looking at child

3    pornography at 18 years old. *Id.* When asked if he had ever masturbated to child

4    pornography, Collings responded "possibly." *Id.*

5        A subsequent forensic examination of Collings's devices revealed two image files

6    and 36 video files of child pornography on the Hewlett-Packard computer tower, four

7    images and 46 video files of child pornography on the Toshiba laptop, 358 video files of

8    child pornography on the ASUS laptop, and four images and 41 video files of child

9    pornography on the Western Digital external hard drive. *Id.* at ¶ 18. At least some of the

10   child pornography files depicted children as young as two years of age, and there were

11   some files with sadistic and masochistic conduct. *Id.* at ¶¶ 19–22.

### III.    Argument

13       The goal of sentencing is to "'impose a sentence sufficient but not greater than

14   necessary' to reflect the seriousness of the offense, promote respect for the law, and provide

15   just punishment; to afford adequate deterrence; to protect the public; and to provide the

16   defendant with needed . . . correctional treatment." *United States v. Carry*, 520 F.3d 984, 991

17   (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)). The Court considers "the nature and

18   circumstances of the offense and the history and characteristics of the defendant," "the

19   need for the sentence imposed," "the kinds of sentences available," the applicable

20   sentencing guideline range, any pertinent policy statement, sentences imposed on other

21   similarly situated defendants, and the need for victim restitution. 18 U.S.C. § 3553(a).

22   Considering the relevant factors, the Court should impose an 87-month sentence.

23   ///

24   ///

**A.     Child Pornography is a grave crime that requires an appropriate punishment.**

Child pornography possession, receipt, and distribution is a grave, damaging crime. Every time a pedophile views an image of child pornography, he causes harm. *United States v. Blinkinsop*, 606 F.3d 1110, 1117 (9th Cir. 2010). Images of child pornography depict the worst and most intimate days of a child's life—the day that they were raped, tortured, assaulted, and abused. And Collings repeatedly got sexual pleasure from a child's humiliation and pain.

All of the children depicted in Collings's collection were victimized by his actions. Previous victims of child pornography—and some of Collings's victims—have described, in detail, the pain that they continually suffer based upon the possession of images and videos of their abuse. They specify the horror they face when they learn another pedophile has viewed the worst moments of their life; the anxiety that someone might recognize them from videos of their rape; and the fear that someone may pursue them because of what they have seen.

Because of Collings, there is a market for these images, without which the abuse would have ended at a finite point. In its modern iteration, the market is amplified and exacerbated by the proliferation of the Internet and file-sharing. In this way, child pornography is the worst type of exploitation because it is never-ending. Victims have to live knowing that their abuse is being shared online to satisfy the sexual desires of deviants who seek it out and make it available to others. Because of people like Collings, these children can never heal. As aptly noted by the mother of one of Collings's victims, the victims have a "lifelong sentence of abuse and exploitation." Yet, Collings will escape a lifelong sentence.

Because of the severity of this crime, Congress has demonstrated its interest in providing serious penalties, reflecting the reality that child pornography is becoming more rampant, violent, and likely to involve younger victims. *See* 18 U.S.C. § 2252(b)(2) (the Child Protect Act of 2012 doubled penalty for possessing images of prepubescent minors under age twelve). Congress's consistent, gradual increases in the penalties for child pornography offenses, even in the face of vocal critics who minimize these offenses, reflect society's collective desire to protect children and significantly punish these grave offenses.

**B.    The Guidelines have strong bases and appropriately further society's interest in protecting children.**

Congress, via the Sentencing Commission, has appropriately sought to protect children, a goal with strong bases in the Commission's assessment of child pornography offenses and empirical research regarding child exploitation offenses and offenders. Accordingly, the Court should sentence defendant in accordance with the guidelines recommendation in the plea agreement.

**1.    The Guidelines properly reflect societal values.**

By requiring the Commission to consider public concerns when establishing guidelines, Congress ensured that ordinary citizens, who find offenses such as trading child pornography particularly egregious, have a voice in the justice system and that the punishment for these crimes reflects the community's concerns. 28 U.S.C. § 994(c).

**2.    The Commission has reported compelling reasons for serious penalties for these crimes.**

In 2012, the Commission submitted its most recent evaluation of the child pornography guidelines in its Report to the Congress: Federal Child Pornography Offenses

5

1    (the "2012 Report.").[1] The 2012 Report notes that "[a]ll child pornography offenses,

2    including the simple possession of child pornography, are extremely serious because they

3    both result in perpetual harm to victims and validate and normalize the sexual exploitation

4    of children." 2012 Report, Executive Summary, at vi.

5            It also explains that modern child pornography typically involves very young

6    children: about one half of offenders possess one or more videos or images "depicting the

7    sexual abuse of a child under six years old and approximately one quarter of offenders

8    possess one or more images depicting the sexual abuse of a child two years old or

9    younger." *Id.* at vi-vii. The report further describes how the Internet has perpetuated and

10   heightened the harm to victims by causing them to "live with persistent concern over who

11   has seen images of their sexual abuse and suffer by knowing that their images are being

12   used by offenders for sexual gratification and potentially for 'grooming' new victims of

13   child sexual abuse." *Id.* at vi-vii. Internet distribution, the Committee states, is a lifelong

14   harm. Online communities validate and escalate the abuse of children and normalize this

15   horrific violence.

16           Thus, at the beginning of its report, the Sentencing Commission emphasized the

17   terrible impact of child pornography. It described what those in the criminal justice system

18   have long known: child pornography has a highly destructive, life-long impact on victims.

19   It devastates children and undermines all of society because the effects of this abuse extend

20   to those who are close to the victim, including parents, partners, spouses, friends, and

21   siblings, and because it destroys the fabric of a community when rape, violence, and

22

23

---

24   [1] *See* http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses).

6

1    exploitation of children are normalized and traded, collected, and used for sexual

2    gratification.

3        Thus, the Commission demonstrated that, given the content and nature of

4    Collings's child pornography collection and his behavior, it agrees with significant

5    enhancements and a commensurate sentence. Furthermore, research in the area of child

6    exploitation supports the need for incarcerating Collings in order to protect children.

7        **3.     Many courts give and affirm Guideline sentences in non-production
         child pornography cases throughout the country.**

8

9        While a handful of judges have criticized U.S.S.G. § 2G2.2 and varied downward,

10   the vast majority of judges have found Guideline sentences in these cases to be appropriate

11   and just. The Ninth Circuit and every other circuit has routinely affirmed Guidelines

12   sentences in child pornography cases. *See e.g.*, *United States v. Savanh*, 727 F. App'x 931, 936

13   (9th Cir.), cert. denied, 139 S. Ct. 292 (2018); *United States v. Byington*, 600 F. App'x 553,

14   554 (9th Cir. 2015); *United States v. Maier*, 646 F.3d 1148 (9th Cir. 2011); *United States v.*

15   *Carlson*, 395 F. App'x 413 (9th Cir. 2010); *United States v. Blinkinsop*, 606 F.3d 1110 (9th Cir.

16   2010).

17       **4.     The three-level variance contemplated by the plea agreement
         provides sufficient consideration of the factors under 18 U.S.C. 3553
         supporting a variance from the applicable Guidelines.**

18

19       Despite the strong justification for the Guidelines as outlined by the Commission, as

20   well as the numerous courts that have imposed guideline sentences, the government

21   nonetheless recognized that certain aspects of this particular case and this particular

22   defendant warranted a variance from those otherwise applicable Guidelines.[2] Thus, instead

23   —————————————

24   [2] Collings goes into great detail concerning the plea negotiations in this case. The
     government does not wish to violate Federal Rules of Criminal Procedure 11(c)(1) by

of advocating for a Total Offense Level of 32, with a resulting Guidelines range of 121-151 months, the government agreed that this Court should apply a Total Offense Level of 29, with a range of 87-108 months. The government has furthered exercised its discretion to argue for a low-end sentence for that applicable range.

Collings, his family, and his friends described Collings's difficult childhood, which, they claim was marred by divorce, a custody battle, and physical abuse. *See* ECF No. 20, at 3–5; ECF No. 21. They also describe Collings's charity and successful business ventures. *See* ECF No. 20 at 5–8; ECF No. 21. The three-level variance provided in the plea agreement accounts for Collings's childhood and charitable work. The variance also accounts for Collings early and consistent efforts to undergo treatment for his pedophilia. Any further variance would ignore the horrific nature of Collings's crime and the fact that Collings admitted to downloading and viewing child pornography for more than eight years. Because of the continuing nature of Collings's offensive conduct, no further variance is warranted.

**C.    The Court should give no weight to Collings's Abel Assessments.**

The government asks that the Court give no weight to the forensic evaluation report submitted by Collings, as it lacks "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3. In reaching his conclusion that Collings does not suffer from pedophilia and is not at risk to reoffend, Dr. Pacult relied upon the untested and unproven Abel Assessment for Sexual Interest ("AASI").

---

involving this Court in the conversations various Assistant United States Attorneys who have since left the office had concerning negotiations, but can confirm that most of the mitigation Collings now presents to this Court was submitted to the United States Attorney's Office prior to Collings entering his plea agreement. Collings further asserts that the case was negotiated just months before the statute of limitations was set to expire, but child pornography offenses have no such statute of limitations. *See* 18 U.S.C. 3299.

1    AASI is a two-part test invented by Dr. Gene Abel. Vladimir Coric, Seth Feuerstein,

2    Frank Fortunati, Steven Southwick, Humberto Temporini, & Charles Morgan, *Assessing*

3    *Sex Offenders*, 2 Psychiatry 26, 28 (2005). The first part involves a questionnaire wherein the

4    individual who is being evaluated self-reports his sexual preferences, behaviors, and ability

5    to control his sexual behaviors. *Id.* Then, the individual's visual reaction time ("VRT") is

6    measured to various visual stimuli, including slides of clothed children, teen, and adults. *Id.*

7    The test assumes that the longer a subject focuses on a slide, the greater the interest in the

8    slide's content.[3] *Id.* The individual is also asked to self-report his degree of arousal to the

9    visual stimuli. *Id.* Thus, the AASI assesses sexual interest in the stimuli, but it does not

10    evaluate the risk an individual may pose. The data is then sent to Abel Screening, Inc. for

11    analysis, and a report of the subject's response patterns is later provided to the testing site.

12    *Id.*

13    Various courts, including the Ninth Circuit, have seriously questioned the

14    informative value of the AASI. In *United States v. Birdsall*, 243 F. Supp.2d 1128, 1131 (D.

15    Mont. 2003), aff'd, 97 Fed. Appx. 721 (9th Cir. 2004), the court found that the AASI is a

16    psychiatric instrument designed to be used for treatment, not for diagnostic purposes. In

17    fact, even Dr. Abel has stated that "[t]here has never been a claim that The Abel

18    Assessment could be used to screen pedophiles from normals." *Id.* (*quoting* Ready v.

19    Massachusetts, 2002 WL 1255800 (Mass. Super. Ct. May 17, 2002) (*quoting* Dr. Gene G.

20    Abel's Letter to the Editor, Sexual Abuse: A Journal of Research and Treatment)).

21    Courts have also expressed concern with the high rate of error. Much of the

22    assessment depends on the self-reporting of the subject. For example, one of the

23

24    [3] The AASI does not include slides of child pornography, thus it cannot test an individual's interest in child pornography.

9

1    measurements calculated by the AASI, the "danger registry," is calculated solely by the

2    subject's self-reported answers. The Ninth Circuit noted that the "the potential error rate

3    'varies from poor ... to appalling,' which makes it an unreliable instrument." *See United*

4    *States v. Birdsbill*, 97 F. App'x 721, 724 (9th Cir. 2004). Dr. Abel's own study of the AASI

5    concludes that almost 25% of admitted pedophiles were inaccurately classified as non-

6    pedophiles. *United States v. White Horse*, 177 F. Supp.2d 973, ¶ 10 (D.S.D. 2001), *aff'd*, 316

7    F.3d 769 (8th Cir. 2003) (*citing* Gene Abel et. al., *Screening Tests for Pedophilia*, 21 Crim.

8    Just. & Behavior 115–31 (1994)).

9         It is also unclear whether the AASI can protect against those attempting to game the

10   test. As the Ninth Circuit observed, "Dr. Abel did not use a control group and it is unclear

11   how or whether the test ferrets out 'fakers.'" *See Birdsbill*, 97 F. App'x 721 at 724. Various

12   websites, such as https://www.innocentdads.org/abel.htm, deliver detailed descriptions of

13   the AASI, providing individuals the help they would need to deceive the AASI. Thus, there

14   is a possibility that the results of the AASI can be skewed by a participant's own knowledge

15   about the test and how it is conducted.

16        Also, Dr. Abel has not shared how his test calculates results, so the test has not been

17   subject to substantial peer review. *In the Interest of CDK, JLK, and BJK*, 64 S.W.3d 679, 683

18   (Tex. Ct. Appeals Jan. 3, 2002). In response to this, one court quipped that, because the

19   formula has not been shared, the scoring methods "could be mathematically based,

20   founded upon indisputable empirical research, or simply the magic of young Harry Potter's

21   mixing potions at the Hogwarts School of Witchcraft and Wizardry." *Id.* at 683–84.

22   "[Those who have tried to assess the test's validity have come up with dubious and

23   inconsistent results." *See Birdsbill*, 97 F. App'x 721 at 724. Accordingly, "the relevant

24   scientific community does not generally accept the AASI test as a diagnostic test for

1    pedophilia." *Id.*; *see also White Horse*, 177 F. Supp.2d at ¶ 11 ("the Abel Assessment has not

2    achieved widespread acceptance within the scientific community").

3        Thus, the results of the AASI should be rejected for the purposes of sentencing: the

4    test's high error rate, its inability to discern those attempting to game the test, the lack of

5    peer review, and failure to gain acceptance within the scientific community, make the AASI

6    a wholly unreliable tool for measuring Collings's pedophiliac tendencies and his risk of

7    recidivism.[4]

8

---

9    [4] Similarly, this Court should strike Collings's polygraph test results from the record and not
     consider it at sentencing. Multiple courts have expressed their disfavor of polygraph
10   examination evidence and its general inadmissibility in formal proceedings. *See, e.g.*, *United
     States v. Sanchez*, 118 F.3d 192 (4th Cir. 1997) (holding polygraph evidence lacks the
11   widespread acceptance and sufficiently low error rate to be admissible under Federal Rules
     of Evidence 702); *United States v. Call*, 129 F.3d 1402 (10th Cir. 1997) (same); *Meyers v.
12   Arcudi*, 947 F. Supp. 581 (D. Ct. 1996) (holding polygraph examination evidence
     inadmissible because it was not testable and lacked a sufficiently low error rate and
13   controlling standards); *United States v. Pavlenko*, 845 F. Supp. 2d. 1321 (S.D. Fl. 2012)
     (same). Even the Ninth Circuit Court of Appeals, while rejecting a per se rule of
14   inadmissibility, noted the "inherent problematic nature" of polygraph examination
     evidence, which carries "grave potential for interfering with the deliberative process." *United
15   States v. Cordoba*, 104 F.3d 225, 228 (9th Cir. 1997). *See also United States v. Cordoba*, 194,
     F.3d 1053 (9th Cir. 1999) (affirming the district court's decision to exclude the polygraph
16   examination evidence after after the case was remanded for a particularized determination).
     Indeed, the Ninth Circuit Court of Appeals has found that admission of polygraph evidence
17   is within the sound discretion of the district court, in consideration of the Federal Rules of
     Evidence, and that a district court "will rarely abuse its discretion by refusing to admit the
18   evidence." *United State v. Benavidez-Benavidez*, 217 F.3d 720, 725 (9th Cir. 2000). Admission
     of polygraph evidence in formal court proceedings is, of course, distinct from the use of
19   polygraph in the context of sex offender treatment and supervised release. Courts have long
     held that imposing polygraph testing as a condition can assist in supervision. *See United
20   States v. Begay*, 631 F.3d 1168 (10th Cir. 2011); *United States v. Johnson*, 446 F.3d 272, 277 (2d
     Cir. 2006) ("[T]he incremental tendency of polygraph testing to promote ... candor furthers
21   the objectives of sentencing by allowing for more careful scrutiny of offenders on supervised
     release."); *United States v. Dotson*, 324 F.3d 256, 261 (4th Cir. 2003); *United States v. Zinn*, 321
22   F.3d 1084, 1090 (11th Cir. 2003); *United States v. Lee*, 315 F.3d 206, 217 (3d Cir.2003).
     Polygraph testing also results in offenders engaging in less high-risk behavior and the
23   majority of sex offenders find polygraph helpful in both treatment and supervision. Grubin,
     et al., A Prospective Study of the Impact of Polygraphy on High-Risk Behaviors in Adult
24   Sex Offenders, Sexual Abuse, 16(3): 209-222 (2004); Grubin, et al., Accuracy and Utility of
     Post-Conviction Polygraph Testing of Sex Offenders, British Journal of Psychiatry, 188:

Notably, Dr. Pacult did not administer a penile plethysmography test, currently the only demonstrated objective means of assessing pedophilic sexual interest. In contrast with AASI, penile plethysmography involves the direct monitoring of sexual response when viewing or listening to sexual stimuli. R. Karl Hanson, Kelly Morton, & Andrew Harris, Jr., *Sexual Offender Recidivism Risk: What We Know and What We Need to Know*, 989 Annals of the N.Y. Acad. of Sci. 154, 158 (2006). It is considered "the single biggest predictor of sexual offense recidivism." *Id.* Absent any objective corroboration, Dr. Pacult's opinion that Collings does not suffer from pedophilia and is not at risk to reoffend should not be given substantial weight.[5]

**D.    Collings should be sentenced to a lifetime term of supervised release.**

The government requests a lifetime term of supervised release, with all of the conditions proposed in the PSR to be imposed. Collings's likelihood to re-offend will likely be reduced and his rehabilitation will be improved if he remains on supervision for the longest period of time possible. In any event, this long term of supervision will give the community and children in general solace that Collings is under the watchful eye of the

---

479-483 (2006); Kokish, et al., Post-conviction Sex Offender Polygraph Examination: Client-Reported Perceptions of Utility and Accuracy, Sexual Abuse, 17(2): 211-221 (2005). Such is a distinct and disconnected use of polygraph testing that does not involve the admissibility of the evidence.

[5] At a minimum, if this Court is inclined to consider the AASI test and Dr. Pacult's opinions based on the results of that test despite other courts' rejection of the evidence, this Court should take the testimony of Dr. Pacult and examine the information upon which Dr. Pacult is forming his opinion. United States Sentencing Guidelines Section 6A1.3(a) provides that "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." To this end, it is the court's right and responsibility to examine the underlying testing materials to determine whether the questions asked of Collings are relevant to resolving any sentencing determination and to decide how much weight to give to Dr. Pacult's opinion.

1    Court. Lifetime supervision will go far in keeping the community safe from Collings's future

2    crimes and providing offender management services. Lifetime supervision serves the

3    purpose of helping Collings stay accountable and continue to receive treatment after his

4    release from custody and keep the community safe. Probation concurs in that assessment,

5    and the government joins their request for a lifetime term of supervised release.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**IV.    Conclusion**

Based on the above, this Court should sentence Collings to a term of incarceration for 87 months, followed by a lifetime term of supervised release.

Respectfully submitted this 24th day of June, 2020.

NICHOLAS A. TRUTANICH
United States Attorney


*/s/ Supriya Prasad*
Assistant United States Attorney

14